UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL LUCAS,<br><br>            Plaintiff,<br><br>      v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br><br>            Defendant. | Case No.  20-cv-00141-JCS<br><br>**ORDER REGARDING MOTION TO DISMISS**<br><br>Re: Dkt. No. 12 |

## I.      INTRODUCTION

Plaintiff Daniel Lucas asserts claims for breach of contract, misrepresentation, and related theories against Defendant International Business Machines Corporation ("IBM") based on IBM's alleged failure to pay all commissions owed for Lucas's work as a sales representative.  IBM moves to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Court found the matter suitable for resolution without oral argument and vacated the hearing previously set for May 15, 2020.  The case management conference set for the same date remains on calendar and will occur via public videoconference.  *See* dkts. 27, 28.

For the reasons discussed below, IBM's motion is GRANTED only as to Lucas's claims for intentional representation and false promise, and only to the extent those claims are based on representations and commissions other than those related to a sale that Lucas made to Dolby.  The motion is otherwise DENIED, and Lucas may proceed on his remaining claims.  If Lucas wishes to file an amended complaint to cure the defects identified in this order with respect to the claims dismissed, he may do so no later than May 29, 2020.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.     BACKGROUND

### A.     Allegations of the Complaint

Because a plaintiff's allegations are generally taken as true in resolving a motion to dismiss under Rule 12(b)(6), this section summarizes the allegations of Lucas's complaint as if true. Nothing in this order should be construed as resolving any issue of fact that might be disputed at a later stage of the case.

Lucas worked for a company that was acquired by IBM, and he became an IBM employee in April of 2014. Compl. (dkt. 1) ¶ 8. He continued in the same role, selling subscriptions for software and cloud storage to corporate customers, until he resigned in July of 2019. *Id.* ¶¶ 9–10, 25.

IBM paid Lucas a base salary plus commissions on sales, with the terms of his compensation set forth in Incentive Plan Letters ("IPLs") issued for periods of six months at a time. *Id.* ¶¶ 11–13. During the time period at issue, the IPLs provided that Lucas would receive an up-front commission of either eight percent or five percent of each sale, plus an additional three-percent commission paid in monthly installments on some sales. *Id.* ¶ 15. Around the same time that each IPL was issued, Lucas's supervisor would also email Lucas and his colleagues "a list of corporate customers considered to be within their territory and sales group, meaning they would receive commissions for sales to those entities during that IPL period." *Id.* ¶ 14.

The IPLs did not distinguish renewal or expansion sales from sales to a new customer, which required similar work from sales representatives, and IBM initially paid the same commissions on renewal and expansion sales. *Id.* ¶¶ 16–18. For roughly the last year of Lucas's employment with IBM beginning in mid-2018, however, IBM did not pay Lucas commissions for renewal and expansion sales. *Id.* ¶ 19. IBM also "failed to credit several of [Lucas's] 2018 sales for purposes of calculating and paying his three percent monthly commissions in January through June of 2019"—including for at least one customer, Dolby, that was moved to a different territory or sales group, despite a senior vice president having informed that sales group that continuing commissions would still be paid for such customers. *Id.* ¶¶ 20–23.

Lucas repeatedly complained about IBM failing to pay commissions that he had earned,

United States District Court
Northern District of California

and IBM employees acknowledged that Lucas was owed commissions that he has not been paid. *Id.* ¶¶ 24, 26. Lucas resigned in July of 2019 based on IBM's failure to pay him commissions he was owed. *Id.* ¶ 25. In August of 2019, IBM paid Lucas a portion of the commissions he was owed for sales in May and June of 2019, but Lucas still has not received the remainder of what he is owed. *Id.* ¶ 28. Lucas alleges that he is owed a total of $219,000, consisting of $54,000 for sales made in May and June of 2019, $33,000 for monthly three-percent commissions that should have been paid in the first half of 2019, and $132,000 for renewal and expansion sales. *Id.* ¶ 33.

Lucas asserts the following claims: (1) breach of contract, *id.* ¶¶ 35–42; (2) breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 43–49; (3) intentional misrepresentation, *id.* ¶¶ 50–61; (4) false promise, *id.* ¶¶ 62–73; (5) negligent misrepresentation, *id.* ¶¶ 74–84; (6) quasi-contract or quantum meruit, *id.* ¶¶ 85–93; and (7) waiting time penalties under section 203(a) of the California Labor Code, *id.* ¶¶ 94–99. Lucas asserts, and IBM does not dispute, that the Court has subject matter jurisdiction over his claims under California state law based on diversity of citizenship under 28 U.S.C. § 1332, because Lucas is a citizen of California, IBM is a citizen of New York, and the amount in controversy exceeds $75,000. *See id.* ¶ 6.

## B. The Parties' Arguments

IBM moves to dismiss all of Lucas's claims, generally based on its view that the IPLs did not entitle Lucas to the commissions he claims he is owed, but instead granted IBM sole discretion to determine the amount of Lucas's commissions. *See generally* Mot. (dkt. 12). IBM relies primarily on the following provisions of the IPLs:

> **Right to Modify or Cancel:** IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives, assigned territories or account opportunities, applicable incentive payment rates or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, including withdrawing an offered or accepted Incentive Plan Letter.
>
> **Earnings:** Incentive payments you may receive for Plan-to-Date achievement are a form of advance payment based on incomplete business results. Your incentive payments are earned under the Plan terms, and are no longer considered Plan-to-Date advance payments, only after the measurement of complete business results following the end of the full-Plan period. (Or, if applicable, after the date you left the Incentive Plan early.) Incentive payments will be considered earned only if you have met all payment requirements, including:

3

> (1) you have complied with the Incentive Plan; (2) you have not engaged in any fraud, misrepresentation or other inappropriate conduct relating to any of your business transactions or incentives; and (3) the customer has paid the billing for the sales or services transaction related to your incentive achievement.

Sullivan Decl. (dkt. 12-1) Ex. 1 at 2; *id.* Ex. 2 at 3.[2]

> **Adjustment for Errors:** IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. Depending on when an error is identified, corrections may be made before or after the last day of the full-Plan period, and before or after the affected payment has been released.

> **Review of a Specific Transactions:** If a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments.

*Id.* Ex. 1 at 2–3; *id.* Ex. 2 at 4; *see* Mot. at 5–6.

IBM argues that other decisions from this district have "addressed nearly identical claims against IBM, and [have] repeatedly held that the disclaimers contained in IBM's incentive plan letters preclude breach of contract claims under California law." Mot. at 2 (citing *Pfeister v. IBM*, No. 17-cv-03573-DMR, 2017 U.S. Dist. LEXIS 170970 (N.D. Cal. Oct. 16, 2017); *Kemp v. IBM*, No. C-09-3683 MHP, 2010 U.S. Dist. LEXIS 118801 (N.D. Cal. Nov. 4, 2010); *Schwarzkopf v. IBM*, No. C 08-2715 JF, 2010 U.S. Dist. LEXIS 46813 (N.D. Cal. May 12, 2010), as well as decisions from other districts). Lucas contends that those cases are distinguishable because the versions of the IPLs at issue expressly provided that they did "not constitute an express or implied contract or a promise by IBM to make any distributions," and reserved IBM's right to modify compensation terms "at any time during the Plan period up until any related payments have been earned under the Plan terms." Opp'n (dkt. 20) at 7. According to Lucas, a better reading of the IPLs at issue here, which do not include those terms, is that IBM had discretion only to modify or

---

[2] Lucas does not dispute that the Court may consider the terms of the IPLs as incorporated by reference by his complaint. Opp'n (dkt. 20) at 6 n.1.

United States District Court
Northern District of California

cancel IPLs prospectively, and to alter commissions earned when an IPL was in effect for specific reasons not applicable here, such as a disproportionate benefit or an error in computation or assignment. *Id.* at 6–10. IBM cites a recent district court decision in its reply holding that an IPL that, like here, omitted the "does not constitute a contract" language addressed in earlier cases nevertheless "establish[ed] that Plaintiff and Defendant either (1) reached an agreement via the IPL giving Defendant unfettered authority to modify or cancel the agreement up until the determination of the 'final business result' or (2) did not have a meeting of the minds about the nature of the commission payment procedure at IBM." *Kingston v. IBM*, No. C19-1488 MJP, 2020 WL 1875523, at *4 (W.D. Wash. Apr. 15, 2020); *see* Reply (dkt. 24) at 4.

Lucas argues that wholly absolving IBM of any contractual obligation to pay commissions as set forth in the IPLs would violate section 2751 of the California Labor Code, which requires that where any contract for employment involves compensation in the form of commissions, the "contract shall be in writing and shall set forth the method by which the commissions shall be computed and paid." Cal. Lab. Code § 2751(a); *see* Opp'n at 1–2, 6, 11–12. Lucas contends that a section of the IPLs providing that local legal requirements prevail over the terms of the IPLs and that any section that conflicts with local law may be severed requires that the IPLs must be read in conjunction with section 2751 as an enforceable contract precluding unlimited discretion is paying commissions. Opp'n at 11–12.

The parties also dispute whether Lucas has satisfied the heightened pleading standard of Rule 9(b) for his intentional misrepresentation claim, whether Lucas could reasonably rely on any purported promise to pay commissions in light of the IPLs granting IBM discretion to modify compensation terms, and whether the purportedly discretionary nature of commissions under the IPLs bars his remaining claims for reasons similar to IBM's argument with respect to the contract claim.

## III.    ANALYSIS

### A.    Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss

United States District Court
Northern District of California

1  under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp.*

2  *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a claimant's burden at the pleading stage

3  is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which

4  sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing

5  that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

6  In ruling on a motion to dismiss under Rule 12(b)(6), the court generally takes "all

7  allegations of material fact as true and construe[s] them in the light most favorable to the non-

8  moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  Dismissal

9  may be based on a lack of a cognizable legal theory or on the absence of facts that would support a

10  valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A pleading

11  must "contain either direct or inferential allegations respecting all the material elements necessary

12  to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

13  562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

14  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a

15  cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550

16  U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual

17  allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

18  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

19  enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim

20  must be "'plausible on its face,'" meaning that the claimant must plead sufficient factual

21  allegations to "allow the court to draw the reasonable inference that the defendant is liable for the

22  misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

23  **B.    Breach of Contract**

24  Under California law, the "cause of action for damages for breach of contract is comprised

25  of the following elements: (1) the contract, (2) plaintiff's performance or excuse for

26  nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong*

27  *Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004).  "To

28  establish formation of a contract, a plaintiff must plead that: (1) the contract terms are clear

United States District Court
Northern District of California

1     enough that the parties could understand what each was required to do; (2) the parties agreed to

2     give each other something of value; and (3) the parties agreed to the terms of the contract."

3     *Webpass Inc. v. Banth*, No. C14-02291 HRL, 2014 WL 7206695, at *4 (N.D. Cal. Dec. 18, 2014)

4     (citing *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998)); *see also* CACI No.

5     302.  "To be enforceable, a promise must be definite enough that a court can determine the scope

6     of the duty and the limits of performance must be sufficiently defined to provide a rational basis

7     for the assessment of damages."  *Ladas v. Cal. State Auto. Ass'n*, 19 Cal. App. 4th 761, 770

8     (1993).  The parties here dispute, at least to some degree, both whether the IPLs constitute

9     contracts, and whether Lucas has sufficiently alleged that IBM breached them.

10          The Court recognizes that a large number of other district court decisions have held that

11    other IBM IPLs were not enforceable as contracts.  Virtually all of those decisions considered

12    IPLs that specifically stated the "Plan does not constitute an express or implied contract or a

13    promise by IBM to make any distributions under it."  *See, e.g.*, *Swafford v. IBM*, 383 F. Supp. 3d

14    916, 935 (N.D. Cal. 2019).  Because the IPLs here include no equivalent language, those decisions

15    are of limited value in determining whether these IPLs are contracts.[3]

16          With no express disclaimer of intent to contract, the IPLs appear to be contractual in

17    nature.  Each IPL begins by stating: "How your incentive earnings are determined: You earn a

18    direct percentage of the [Revenue[4]] that you achieve according to the payout rate shown below,"

19    and then sets forth the 3%, 5%, and 8% commission rates referenced in Lucas's complaint.

20    Sullivan Decl. Ex. 1 at 1–2; *id.* Ex. 2 at 1–3.  The IPLs indicate dates that they were accepted by

21    Lucas.  *See id.*  In conjunction with Lucas's allegations, these provisions would be sufficient at the

22

23    _____

      [3] Although IBM asks this Court to follow the many decisions holding that facially distinguishable
24    IPLs are not enforceable contracts, it is not clear whether IBM in fact believes that is the case.
      IBM argues, for example, that the IPLs satisfy Labor Code section 2751, which requires that in
25    any contract of employment involving commissions, "the *contract* shall be in writing and shall set
      forth the method by which the commissions shall be computed and paid."  Cal. Lab. Code.
26    § 2751(a) (emphasis added); *see* Reply at 5–6.  IBM also asserts that "the IPLs were an agreement
      between the parties that spelled out respective rights and responsibilities relating to commissions."
27    Mot. at 9.
      [4] Some of these provisions use the terms "Blended" or "ACV" instead of "Revenue."  Based on
28    the allegations of Lucas's complaint, the Court understands those terms as referring to other
      metrics of sales.

United States District Court
Northern District of California

1  pleading stage support a claim that IBM breached its promise to pay Lucas commissions at

2  defined rates for his work as a sales representative.

3      The question, then, is whether other terms of the IPLs render them non-contractual or

4  unenforceable, or whether any provisions permitted IBM to withhold the commissions Lucas

5  claims he was owed.  The Court examines the provisions that IBM has cited in turn.

6      The "right to modify or cancel" provides that IBM may "adjust the Plan terms, including,

7  but not limited to, changes to sales performance objectives, assigned territories or account

8  opportunities, applicable incentive payment rates or similar earnings opportunities, or . . . modify

9  or cancel the Plan . . . including withdrawing an offered or accepted Incentive Plan Letter."  *E.g.*,

10 Sullivan Decl. Ex. 1 at 2.  This provision is amenable to an interpretation allowing IBM only to

11 make prospective changes, rather than modifying terms as applicable to commissions that Lucas

12 had already earned.[5]  Nothing in Lucas's complaint or the IPLs themselves indicates that IBM

13 modified or canceled the IPLs before Lucas allegedly earned the commissions at issue.  Nor does

14 this provision, if interpreted as allowing only prospective changes, render the IPLs indefinite: the

15 parties' obligations remain clear unless and until IBM modifies or cancels the agreement, at which

16 time either no further contract would exist, or the modified terms could be scrutinized on their

17 own merits.

18     The "Earnings" provision states that incentive payments are an "advance" until they are

19 "earned," which occurs "only after the measurement of complete business results following the

20 end of the full-Plan period.  (Or if applicable, after the date you left the Incentive Plan early)."

21 *E.g.*, Sullivan Decl. Ex. 1 at 2.  This section also provides that, for commissions to be "earned," a

22 sales representative must "have met all payment requirements," which include the representative

23 complying with the terms of the incentive plan, the representative not engaging in fraud or other

24 inappropriate business conduct, and the customer paying for the product at issue.  *Id.*  Nothing on

25 the face of this provision grants IBM unfettered discretion to alter or avoid paying commissions,

26

27  _____
[5] While it is at least conceivable that, on an evidentiary record, IBM could show that this provision
28 was intended to allow for retroactive adjustments to commissions already earned, the Court
declines to interpret it as such at the pleading stage.

1  nor is there any basis at this stage of the case to disregard Lucas's allegations that the commissions

2  at issue were "earned according to the terms of the parties' agreement." *E.g.*, Compl. ¶ 40.

3        The "Adjustment for Errors" and "Review of a Specific Transaction" provisions more

4  clearly authorize IBM to adjust or avoid commission payments, but both limit that authority to

5  particular circumstances. *See, e.g.*, Sullivan Decl. Ex. 1 at 2–3. The "Adjustment for Errors"

6  section only authorizes IBM to adjust commissions where "incorrect incentive payments result[ed]

7  from incomplete incentives processes or other errors in the measurement of achievement or the

8  calculation of payments, including errors in the creation or communication of sales objectives."

9  *Id.* IBM has not specifically argued that the parties would not understand the meaning of "errors"

10  as used in this section, or that courts would not be able to determine whether an adjustment was

11  based on an "error" or "incomplete incentive process." Nor has IBM identified any basis for

12  concluding at the pleading stage that such an "error" prompted its failure to pay Lucas the

13  commissions he allegedly earned.

14        Finally, IBM makes much of the fact that the "Review of a Specific Transaction" provision

15  includes language stating that IBM may "review and, in its sole discretion, adjust the incentive

16  achievement and/or related payments" on certain transactions. Reply at 3. In full, that provision

17  reads as follows:

> **Review of a Specific Transactions:** If a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments.

23  Sullivan Decl. Ex. 1 at 3. As this section is written, IBM has "sole discretion" to adjust incentives

24  only if a particular transaction has a disproportionate effect on payment as compared to either the

25  "opportunity anticipated" or the sales representative's "performance contribution." *See id.* It is

26  not clear that the IPL would permit IBM to reduce compensation for a typical sale with typical

27  work performed by a representative. This section is at least amenable to an interpretation that the

28  words "sole discretion" apply only to the *remedy* for a disproportionate commission—in other

United States District Court
Northern District of California

words, the *amount* by which it would be adjusted—and not to the determination of whether a commission was disproportionate.  IBM has not specifically argued that a court could not evaluate whether a commission was disproportionate either to anticipated opportunity or to an employee's contribution.  IBM also has not argued that it based its decision on this provision, that the commissions at issue were in fact disproportionate, or that such issues could properly be resolved on the pleadings.

Reading the IPLs as a whole, the Court is not persuaded—at least for the purpose of the present motion to dismiss under Rule 12(b)(6)—that the IPLs are non-contractual or unenforceable.  The Court also concludes that Lucas has sufficiently alleged a breach, in that the IPLs set forth a default commission rate, Lucas alleges that he did not receive payment at that rate, and there is no basis to conclude that any of the potential excuses for nonpayment under the terms of the IPLs apply to this claim.  Even if the Court were to apply the reasoning of *Kingston*, which held that a similar IPL could at most represent "an agreement via the IPL giving Defendant unfettered authority to modify or cancel the agreement up until the determination of the 'final business result,'" 2020 WL 1875523 at *4, Lucas's allegation here that he "earned" the commission at issue "according to the terms of the parties' agreement" is sufficient to state a claim that a "final business result" had occurred, and IBM no longer had a right to alter the agreement as to such commissions.  IBM's motion is DENIED as to the claim for breach of contract.

### C.   Breach of Implied Covenant of Good Faith & Fair Dealing

As with the breach of contract claim, IBM moves to dismiss Lucas's claim for breach of the implied covenant of good faith and fair dealing based on its arguments that the IPLs did not create an enforceable obligation to pay Lucas a commission and that the IPLs provided IBM with unfettered discretion to alter their terms and withhold commissions.  Mot. at 7–11.  As discussed above, the Court declines to so hold, at least on the pleadings.  IBM's motion is therefore DENIED as to this claim.

### D.   Intentional Misrepresentation and False Promise

The parties address Lucas's claims for "intentional misrepresentation" and "false promise" together.  *See* Mot. at 11–15; Opp'n at 14–22.

United States District Court
Northern District of California

"[A]n action based on a false promise is simply a type of *intentional* misrepresentation, i.e., actual fraud." *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 159, 2 Cal. Rptr. 2d 861 (1991). The elements of fraud are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638, 49 Cal. Rptr. 2d 377, 909 P.2d 981 (1996). "A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." *Id.*

*Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 960 (9th Cir. 2013). The Court also analyzes these two claims together.

Rule 9(b) of the Federal Rules of Civil Procedure sets a heightened pleading standard for claims based on fraud. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Ninth Circuit has held that in order to meet this standard, a "complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity," *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993), or in other words, "'the who, what, when, where, and how' of the misconduct charged," *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation omitted). "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns*, 567 F.3d at 1124 (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)) (ellipsis in original).

IBM moves to dismiss Lucas's fraud claims on the grounds that he has not satisfied the Rule 9(b) pleading standard, that he has not alleged specific intent to defraud, and that he cannot show justifiable reliance because the IPLs granted IBM the right to modify the terms of its incentive plan.

### 1.    Particularity

Lucas identifies the following purported representations as relevant to his fraud claims: (1) the IPLs for the second half of 2018 and the first half of 2019, Opp'n at 15 (citing Compl. ¶¶ 12, 13, 15; Sullivan Decl. Exs. 1, 2); (2) lists of customers considered to be in Lucas's territory, *id.* (citing Compl. ¶ 14); (3) an email from a senior vice president stating that sales representatives

11

1    would receive ongoing commissions in 2019 for sales in the fourth quarter of 2018 even if the

2    customer was later reassigned to a different sales group or territory, *id.* (citing Compl. ¶ 22);

3    (4) IBM's "past practices of paying Plaintiff commissions in conformity with its representations,

4    including paying commissions on sales that renewed or expanded previous sales on the same

5    terms as initial sales," *id.* at 15–16 (citing Compl. ¶¶ 17, 18, 56, 68, 80); and (5) acknowledgment

6    by two IBM employees that Lucas was owed commissions, *id.* at 16 (citing Compl. ¶ 26).  Lucas

7    also cites, among other specifics, his allegation that IBM owes him "approximately $54,000 for

8    May and June 2019 sales; approximately $33,000 for three percent monthly commissions that

9    should have been paid in January through June of 2019 related to sales made in 2018; and

10   approximately $132,000 for renewal and expansion sales throughout approximately Plaintiff's

11   final year of employment."  *Id.* (citing Compl. ¶ 33).

12         To the extent that Lucas's claims are based on ongoing three-percent commissions for

13   sales to Dolby, he has included sufficiently particular allegations that IBM's "senior vice

14   president, Jason Gartner" sent an email "on or around October 11, 2018 communicating a sales

15   incentive to the effect that for sales of certain products in the fourth quarter of 2018, the sales

16   representative who made the sale would continue to receive the three percent monthly

17   commissions in 2019, even if that customer was moved to a different territory or sales group"; that

18   this promise should have applied to a sale that Lucas made to Dolby; and that IBM did not

19   continue to pay Lucas three-percent commissions for the Dolby sale after Dolby was moved to a

20   different territory or sales group in 2019.  Compl. ¶¶ 22–23.  The Court declines to dismiss

21   Lucas's fraud claims based on unpaid commissions on the Dolby sale.

22         Lucas's remaining allegations lack sufficient particularity.  He has not alleged the

23   customers to which he sold products, the amount of commissions, if any, that IBM paid him for

24   those sales, or the total amount that he should have received under the IPLs or some other

25   purported promise.  It is not clear whether Lucas believes that the IPLs themselves are sufficient to

26   constitute a promise to pay commissions on sales to existing customers or whether such an

27   understanding requires considering IBM's past practice, and the parties have not addressed the

28   extent to which past practice can support a fraud claim.  To the extent that Lucas cites as

United States District Court
Northern District of California

12

misrepresentations other IBM employees' alleged acknowledgement of commissions owed after Lucas had made the sales at issue, he has not explained how those acknowledgements would have been intended to defraud him, or how, if at all, he relied on those acknowledgments to his detriment.  Lucas's vague allegations that the promise of ongoing commissions at issue for the Dolby sale could also apply to "possibly more" and "possibly other sales," Compl. ¶ 23, are also inconsistent with Rule 9(b)'s particularity requirement, and Lucas has provided no explanation of the nature of the parties' disagreement with respect to the May and June 2019 sales.  Lucas asserts in his opposition brief that he communicated at least some of these details to IBM before bringing this action, and submits some such communications as attachments to a declaration by his attorney submitted with his brief, but while those extraneous documents suggest that Lucas might be able to amend to cure at least some of the defects identified above, they are not a substitute for allegations that must be included in Lucas's complaint under Rule 9(b).

IBM's motion is GRANTED IN PART as to Lucas's intentional misrepresentation and false promise claims, which are DISMISSED with leave to amend, except that Lucas may proceed on these claims to the extent they are based on the alleged promise to pay ongoing commissions for his sale to Dolby in the fourth quarter of 2018.

### 2.    Intent to Defraud

Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally" in asserting a claim for fraud.  Fed. R. Civ. P. 9(b).  "'[G]enerally' is a relative term," and such allegations must still meet the plausibility standard applicable to pleading a claim that falls outside of Rule 9(b)'s heightened standard of particularity.  *Iqbal*, 556 U.S. at 686–87.  Lucas alleges that IBM made the relevant representations—including the representation that IBM would pay ongoing commissions for customers like Dolby that were later moved to different sales groups or territories—"with the intention that [Lucas] would rely on them, to induce [Lucas] (through expectations of enticing compensation) to continue his employment as a competent sales representative."  Compl. ¶ 55.  The Court finds IBM's straightforward motivation to induce its sales representatives to sell additional products, as well as its alleged failure to follow through on the promise, sufficient at the pleading stage to satisfy *Iqbal*'s plausibility standard for

the conclusion that IBM did not intend to honor that promise when it was made.[6]  The Court declines to dismiss the surviving fraud claims (based on unpaid ongoing commissions for the Dolby sale) for failure to allege intent to defraud.

### 3.    Justifiable Reliance

IBM argues that Lucas cannot allege justifiable reliance on any representations regarding commissions because the IPLs gave IBM the right to modify incentive compensation at any time. Mot. at 14–15.  Because, as discussed above in the context of Lucas's contract claim, the Court holds that the IPLs are at least amenable to an interpretation restricting such rights to circumstances that Lucas has not alleged were present, the Court declines to follow decisions that have held that similar IPLs—most if not all of which included disclaimers of intent to contract that are not present here—rendered any reliance on promises of commissions unreasonable.  *See, e.g.*, *Middleton v. IBM*, 787 F. App'x 619, 622 (11th Cir. 2019).

The Court also agrees with decisions that have held that plaintiffs may proceed on fraud claims against IBM based on representations outside of IPLs, and that the reasonableness of reliance on such representations is a question of a fact inappropriate for resolution on the pleadings.  *Swafford*, 383 F. Supp. 3d at 929–30; *Beard v. IBM*, No. C 18-06783 WHA, 2019 WL 1516592, at *4–5 (N.D. Cal. Apr. 7, 2019).  IBM attempts to distinguish those cases on the basis that they involved allegations "that PowerPoint presentations promised uncapped commissions but that IBM capped their commissions anyway," while in this case Lucas "makes no allegations about representations in educational materials conflicting with his IPL disclaimers."  *See* Mot. at 15 n.6; Reply at 9.  IBM has not explained how an email from a senior vice president setting forth a specific policy for commissions to be paid under specific circumstances over a particular period of time provides less of a basis for reliance than the "educational materials" at issue in *Swafford* and *Beard*.  While IBM also notes that *Swafford* and *Beard* dismissed claims based on oral representations by managers, *see* Reply at 9–10, they did so for failure to meet the particularity

---

[6] The Court notes—but does not rely on, as it is not alleged in the complaint—that IBM's consistent litigation position that it is not bound by any representations it makes regarding incentive compensation could perhaps further support a conclusion that it did not intend to honor statements to its employees regarding such compensation.

requirements of Rule 9(b), not because the IPLs rendered the plaintiffs' alleged reliance unreasonable as a matter of law.  *See Swafford*, 383 F. Supp. 3d at 928, 930; *Beard*, 2019 WL 1516592, at *5.

IBM's motion to dismiss Lucas's fraud claims for lack of reasonable reliance is DENIED.

### E.   Negligent Misrepresentation

IBM moves to dismiss Lucas's claim for negligent misrepresentation solely for lack of justifiable reliance.  *See* Mot. at 15–16.  For the same reasons discussed above with respect to Lucas's fraud claims, the Court holds that Lucas has sufficiently alleged justifiable reliance.  The motion to dismiss his negligent misrepresentation claim is therefore DENIED.[7]

### F.   Quasi-Contract/Quantum Meruit

"A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice . . . .  However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation."  *Hedging Concepts, Inc. v. First All. Mortg. Co.*, 41 Cal. App. 4th 1410, 1419 (1996).

IBM argues that Lucas's quasi-contract claim should be dismissed because the parties' relationship was governed by the IPLs (even though IBM contends that IPLs did not include an enforceable obligation to pay commissions), because it was not unjust for IBM to withhold commissions when, in IBM's view, the IPLs granted it the right to do so, and because Lucas has not sufficiently alleged that he was owed more than he received.  Although the Court declines to hold on the pleadings that the IPLs are not enforceable as contracts, it is possible that IBM could show that to be the case on an evidentiary record.  Even if, as IBM argues, the IPLs were otherwise enforceable but did not create an enforceable obligation *to pay commissions*, the absence of such a duty could raise questions of whether the IPLs include adequate consideration,

---

[7] Courts are divided as to whether Rule 9(b)'s heightened pleading standard applies to claims for negligent misrepresentation.  *See, e.g.*, *Cutler v. Rancher Energy Corp.*, No. SACV 13-00906-DOC, 2014 WL 1153054, at *3–6 (C.D. Cal. Mar. 11, 2014) (citing cases on both sides of this issue and concluding that Rule 9(b) does not apply).  In the absence of any argument that Rule 9(b) should apply or that Lucas's allegations do not meet its standards with respect to his claim for negligent misrepresentation, the Court declines to dismiss this claim on that basis.

United States District Court
Northern District of California

whether they satisfy Labor Code section 2751, and if not, whether the appropriate remedy would include invalidating the IPLs as a whole.  Given such uncertainties, the Court allows Lucas to pursue his quasi-contract claim in the alternative to his contract-based claims, and DENIES IBM's motion as to this claim.

### G.   Waiting Time Penalties

Sections 202 and 203 of the California Labor Code provide that employees may recover penalties if all wages due are not paid at the conclusion of the employment relationship, so long as the employee provides notice at least seventy-two hours before resigning.  The California Labor Code includes commissions within its definition of "wages."  Cal. Lab. Code § 200(a).  IBM moves to dismiss Lucas's claim for waiting time penalties solely on the basis that he has not plausibly alleged the he was owed more than he received.  Mot. at 18.  Because the Court declines to dismiss Lucas's claim for breach of contract, IBM's motion to dismiss his claim for waiting time penalties is DENIED.

## IV.   CONCLUSION

For the reasons discussed above, IBM's motion is GRANTED only as to Lucas's intentional misrepresentation and false promise claims, and only to the extent those claims are based on representations and unpaid commissions other than those related to the sale he made to Dolby.  The motion is otherwise DENIED.  If Lucas believes he can cure the defects in the claims dismissed by this order, he may file an amended complaint no later than May 29, 2020.  If Lucas does not file an amended complaint by that date, IBM shall file an answer to the remaining claims of the present complaint no later than June 12, 2020.

**IT IS SO ORDERED.**

Dated: May 14, 2020

JOSEPH C. SPERO
Chief Magistrate Judge